UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| LYNN SPARKS and | : | |
| TESA CORPORATION, | : | |
| | : | |
| Plaintiffs, | : | NO. 4:08-CV-00333-JAJ-CFB |
| | : | |
| vs. | : | |
| | : | REPORT AND RECOMMENDATION |
| Z-J GIFTS, I-1 and FANTASY | : | ON MOTION FOR |
| DISTRIBUTORS, LLC, | : | TEMPORARY RESTRAINING ORDER |
| | : | AND PRELIMINARY INJUNCTION |
| Defendants. | : | |

　　　　This matter comes before the Court on the Motion (Clerk's No. 3) filed September 4, 2008, by Plaintiffs, Lynn Sparks and TESA Corporation, seeking a temporary restraining order and preliminary injunction.  Plaintiffs filed their Complaint in the Iowa District Court for Polk County on July 11, 2008, and the case was removed to this Court on August 26, 2008.  In their Complaint, Plaintiffs assert that Defendants, Z-J Gifts, I-1, and Fantasy Distributors, LLC, are liable to them under claims of breach of a written contract (Count I), breach of an oral contract (Count II), and promissory estoppel (Count III), based on Defendants' failure to make monthly payments to Plaintiffs as allegedly required under the noncompetition agreement the parties entered when Plaintiffs sold a business to Z-J Gifts.  Defendants filed a counterclaim against Plaintiffs for breach of contract based on Sparks' alleged breach of the noncompetition agreement.

　　　　In their present Motion seeking a temporary restraining order and preliminary injunction, Plaintiffs request that the Court order Defendants to bring current the monthly payments past due under the noncompetition agreement and to continue the payments until the trial now set for

1

January 20, 2009. Defendants filed a Resistance to the Motion, asserting that because Plaintiffs violated the noncompetition agreement, Defendants have no contractual or other obligation to make the payments at issue; Plaintiffs filed a Reply.

The Motion seeking a temporary restraining order and preliminary injunction was referred to the undersigned on September 4, 2008, for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B). The Court held a hearing on September 22, 2008. At the hearing, Gordon Fischer represented Plaintiffs, and Dean Stowers represented Defendants. The Court granted Plaintiffs' oral motion at the hearing for permission to file a post-hearing memorandum, and granted leave for the parties to file their memoranda by September 26. Plaintiffs filed a notice on September 23 stating that they would not be filing anything further. The Court considers this matter fully submitted. The Court finds and recommends as follows on the issues presented.

## BACKGROUND

Plaintiff Lynn Sparks, 59, lives in West Des Moines, Iowa. From 1994 through May 2001, she worked as a paid consultant for Goalie Entertainment, a Colorado corporation. Goalie operates a nationwide chain of stores, including seven stores in Iowa, that sell adult novelty items. Sparks worked out of an office in her home, where she retained zoning maps, zoning ordinances, and building plans pertaining to Goalie's business. Her duties included "finding locations and relocating existing stores" for Goalie. (Tr. at 21.) She also performed marketing tasks for Goalie.

In 1997, Sparks and her son started a business in the Des Moines area selling T-shirts and gifts. The business, Pinky's, was owned by Plaintiff TESA Corporation, a company originally started several years previously by Sparks and her husband. Sparks' son eventually stopped working for Pinky's, and Sparks then added adult merchandise to the store's inventory.

In May 2001, Goalie hired Sparks as a Goalie employee. During her employment, Sparks worked approximately half of her hours in the company's Colorado office and the other half in her Iowa home. She stated she was responsible for the marketing and advertising of Goalie for stores located across the United States.

In August 2003, Sparks bought a townhouse in West Des Moines. The promissory note for $178,000 is secured by a mortgage. The monthly mortgage payments are $1,530. Sparks testified that the Lynn J. Sparks Trust owns both the townhouse and TESA, and Sparks is the sole beneficiary of the trust while she is alive.

While working for Goalie, Sparks began looking for a buyer for Pinky's. Goalie, through its owner and manager, Ed Wedelstedt, expressed interest in buying Pinky's, but did not do so.

On August 12, 2004, Sparks, as president of TESA, signed an asset purchase agreement selling Pinky's to Defendant Z-J Gifts, a company that owns and operates several stores that retail and market adult entertainment items nationwide, including in Iowa.

The purchase agreement had an integration clause that stated the agreement contained the entire understanding between the parties; that "all representations, promises and prior or contemporaneous understanding between the parties with respect to the subject matter" of the agreement "are merged and expressed" in the agreement; that "any other agreements between the parties with respect to the subject matter" of the agreement were canceled; and that the agreement "shall not be amended, modified or supplemented except in writing signed by both parties." (Pls.' Ex. 1 at 9.)

The agreement listed the purchase price as $200,000, which was allocated as follows: $150,000 for inventory, $30,000 for improvements and other tangible property, and $20,000 for intangible property. The agreement stated that the $200,000 was to be paid at closing.

The purchase agreement provided as conditions precedent that TESA sign a noncompetition agreement and a consulting agreement at the closing. On August 12, 2004, TESA, through Sparks as president, signed the noncompetition and consulting agreements, which were attached as exhibits to the purchase agreement. Ross Jackson, as manager of Z-J Gifts, signed the noncompetition agreement. The agreement stated that Defendant Fantasy Distributors, a Colorado limited liability company, would be a guarantor. Fantasy Distributors and Sparks were the parties to the consulting agreement, and Jackson signed the agreement as Fantasy Distributors' manager.

In the noncompetition agreement, TESA, including its president, Sparks, agreed to not, "directly or indirectly, engage in, carry on, or participate in" for six years any of the following: (1) "The retail marketing, sale or distribution of adult items, including but not limited to, gifts,

3

lingerie, greeting cards, videos, DVD's or other adult entertainment products in the Market Area of the Stores"; or (2) "Divert or solicit any present, future or potential customer of the Stores." (Defs.' Ex. A at 1.)  The agreement defined the phrase, "directly or indirectly, engage in, carry on, or participate in" as follows:

> to act in any capacity whatsoever, including without limitation, whether as a proprietor, partner, lender, joint venturer, licensor, licensee, franchisor, franchisee, employer, agent, employee, representative, consultant, officer, director, or stockholder, except that the mere beneficial or record ownership of less than five percent (5%) of the stock of any corporation shall not constitute an act of competition hereunder.

*Id.* at 2.  The noncompetition agreement stated that, "the 'Market Area of the Stores' shall mean Iowa."  *Id.* at 2.  The parties agreed the geographical scope of the noncompetition agreement "represent[s] the present and potential geographical marketing and sales market of the business of the Stores and that the geographic scope of the covenants is reasonable and necessary."  *Id.* (alteration added).

Sparks testified at the hearing that the word Stores in the agreement referred to one store, Pinky's, which at the time of the purchase agreement, had only one store location – West Des Moines.  She stated that Jackson told her he planned to open several stores in other Iowa cities, and therefore he needed the market area to be defined in the noncompetition agreement as Iowa.  Sparks stated she helped Jackson try to find additional store locations in Iowa, but the expansion in Iowa never occurred.

Sparks stated that when she signed the noncompetition agreement, she knew Goalie and Z-J Gifts were competitors.

In return for Sparks' promise not to compete, Z-J Gifts agreed in the written contract to pay TESA a total of $280,000, to be paid in monthly installments of $4,000 beginning August 15, 2004, and lasting for 70 months.[1]  At the hearing, Sparks testified that the monthly payments

---

[1] Sparks testified that the purchase price for Pinky's was $480,000, with $200,000 to be paid "upfront," and $280,000 to be paid in installment payments.  (Tr. at 5, 31.)  Nothing in the purchase agreement or noncompetition agreement, however, supports the claim that $480,000 rather than $200,000 was the purchase price.  Plaintiffs offered no evidence indicating that the parties modified the integrated purchase agreement, which stated the parties could not amend,

went directly to TESA's bank account. Sparks stated the company used the money to pay the approximately $1,530 monthly payments on her townhouse, her car loan payments, her insurance payments, and her living expenses. Except for the $4,000 monthly payments it received from Z-J Gifts, TESA has no other income, Spark's testified. TESA is not doing any business. TESA has no property other than Sparks' two cars, which include a 1983 Mercedes-Benz.

Both the purchase and noncompetition agreements stated they would be governed by Iowa laws.

According to Sparks, Wedelstedt was angry that she had sold Pinky's to Z-J Gifts. Sparks' employment with Goalie ended in August 2004. In April 2005, however, Wedelstedt rehired Sparks to work for Goalie through its division M & M Sales, a nationwide distributor of adult novelty items. Sparks stated she told Goalie about her noncompetition agreement with Z-J Gifts and said she would not work in Iowa. Sparks testified that her duties as a sales representative included finding new customers for M & M Sales. Her territory did not include Iowa. She visited stores and tried to persuade their managers to buy merchandise from M & M Sales. She sent any sales leads to M & M Sales' office. She herself did not make sales.

Sparks' duties also included shopping at and evaluating adult retail stores belonging to Goalie and its competitors. While shopping at the stores, she observed such factors as the employees' performance, the merchandise displays, and the stores' appearance both inside and outside. After visiting a store, Sparks prepared a report of her findings, which she sent to Goalie. She stated that the purpose for shopping at and evaluating stores was to "make the store better" and to "enhance the sales of this store." (Tr. at 91-92.)

Sparks stated that when Wedelstedt rehired her in 2005, her "main job was supposed to be finding customers for M & M Sales," but Wedelstedt "liked the information so much" that she was providing after visiting and evaluating stores, that he increased the amount of time she spent evaluating stores, and that became her main duty. *Id.* at 27.

---

modify or supplement the written purchase agreement except in writing signed by both parties. Accordingly, the Court finds for purposes of this Report and Recommendation that the purchase price was the $200,000 to be paid at closing, and that the $280,000 to be paid in monthly installments was the amount due under the noncompetition agreement.

Sparks visited and evaluated adult stores nationwide, including stores in California, New Orleans, Memphis, Nebraska, and Iowa.  In Iowa, Sparks shopped at and evaluated two Goalie stores in Council Bluffs and one in Sioux City.  She wrote reports for Goalie concerning the three Iowa stores.  In Sioux City, she also went to a store owned by a Goalie competitor that had recently opened a store in the Des Moines area, where Goalie had two stores.  Sparks testified that her job did not require her to visit the competitor's store in Sioux City, but she was curious to see inside the store.  She met her supervisor and a coworker, Wedelstedt's daughter, at the competitor's store.  She sent Wedelstedt information regarding the competitor's reported legal trouble in Sioux City.  Based on the greater weight of credible evidence, that Court finds that Sparks' visit to Goalie's competitor's store in Sioux City benefited her employer in its sales effort in Iowa.

Prior to agreeing to work for Goalie, Sparks did not ask Jackson or anyone else at Z-J Gifts whether it would be all right with the company if she worked for Goalie again.  She testified, however, that Z-J Gifts learned in the summer of 2005 that she was working for Goalie, when she called Jackson from Memphis, where she was evaluating a Z-J Gifts store, to tell him she had seen a billboard outside his Memphis store on which he should advertise.

While working for Goalie, Sparks continued to live in Iowa.  She stated that she may have sometimes sent e-mails related to her work for Goalie from her home computer.  She used Iowa state tax to calculate her withholding taxes paid on her income from Goalie.

Sparks stated Goalie fired her on September 29, 2005, because of, she believed, the large amount of family medical leave time she used when her mother was sick.  She subsequently filed a lawsuit against Goalie claiming unlawful discharge.  Eventually, the parties reached a settlement for an undisclosed amount.

In January 2006, Sparks offered to buy a building in Grimes, Iowa, on property zoned for adult use.  She said that before actually buying the property, she would have checked with her lawyers and Z-J Gifts to see if buying the property would violate the noncompetition agreement.  She testified that if her purchase offer had been excepted, she would have resold the property, offering to sell it to Z-J Gifts and to Goalie.  If she had sold the property, she stated, she could

have retained an ownership share of less than five percent without violating the noncompetition agreement. Sparks' purchase offer, however, was not accepted.

In late 2006, Sparks found a job working in a Des Moines area retail store. She provided an earning statement from her employer covering the period August 25 through September 7, 2008. She testified the statement was "a typical earnings statement" of what she earns in the job. (Tr. at 46.) The earnings statement showed that she worked 74.10 hours during the two-week period, receiving $703.96 in gross pay, and $539.80 after deductions. She testified that the amount she earns in the job is insufficient to pay her living expenses.

Defendants contend that in March 2008, they became aware that Sparks had violated the noncompete agreement, and Defendants stopped making the payments called for in the agreement. Sparks contends that she did not violate the noncompetition agreement.

Sparks testified that if Defendants do not resume payment under the noncompetition agreement, she may be forced to declare bankruptcy. The bank holding the promissory note on Spark's townhouse sent her a 30-day notice of default on the mortgage payment, and stated that if she did not cure the default by around the time of the hearing, her failure to act might result in foreclosure. She has been trying to sell her townhouse since the spring of 2008. Sparks is behind on her payments to the utility company, and she has received collection letters from various credit card companies stating they may soon begin legal action to collect. She may have to sell her 1983 Mercedes-Benz, which belonged to her late husband and which she was saving for her son as a remembrance of his father. She estimated she could sell the car for approximately $5,000. Sparks testified at the September 22, 2008, hearing that August 2008 bank statements showed that TESA had only $15.86 in its bank account, and that Sparks had a negative balance of $609.72 in her checking account. She testified that she has no other savings.

Sparks testified that if the Court grants a preliminary injunction, ordering Defendants to pay TESA according to the terms of the noncompetition agreement, and if Defendants later prevail at trial, she does not know how she would reimburse Defendants for their payments.

**ANALYSIS**

**I. Standard**

In determining whether to issue a preliminary injunction, a court considers the following factors: (1) the threat of irreparable harm to the movant if the court does not issue a preliminary injunction; (2) the state of the balance between this harm to the movant and the injury that granting the injunction would afflict on the other parties in the case; (3) the likelihood that the movant will succeed on the merits of the case; and (4) the public interest. *PCTV Gold, Inc. v. Speednet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). The movant bears a heavy burden particularly where, as in this case, granting the preliminary injunction will give the movant "substantially the relief it would obtain after a trial on the merits." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (quoting *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485-86 (8th Cir. 1993)).

The same standards apply to Plaintiffs' request for a temporary restraining order. *See Sampson v. Murray*, 415 U.S. 61, 86 (1974); *Doe v. Miller*, 216 F.R.D. 462, 468 (S.D. Iowa 2003) (stating the *Dataphase* test applies to a motion for a temporary restraining order as well as to a motion for a preliminary injunction).

Plaintiffs assert, and Defendants dispute, that Plaintiffs have established they have satisfied the *Dataphase* test, and the Court should issue a preliminary injunction and temporary restraining order.

**II. Irreparable Injury**

To establish irreparable harm, Sparks, through her testimony at the hearing and in her affidavit, has provided evidence that the cessation of Defendants' monthly payments to TESA under the noncompetition agreement has been, and continues to be, a substantial hardship for her, in that she needs the money to supplement her salary and pay for living expenses, including mortgage payments on her townhouse. Sparks contends that because of her deteriorating financial situation, she faces likely bankruptcy and foreclosure on her townhouse, and the need to sell her late husband's car that she was saving for her son. Defendants assert that the

monetary relief that Plaintiffs seek falls within the type of damages that courts have found insufficient to show irreparable injury.

Injunctive relief is "a remedy whose basis 'in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57 (1975) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-507 (1959)); *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 732 n.5 (8th Cir. 2008); *Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir. 1996). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence" of injunctive relief, are insufficient to establish irreparable harm, and the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson*, 415 U.S. at 90 (stating that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury; disagreeing with Court of Appeals that discharged employee's loss of earnings might afford a basis for a finding of irreparable injury and provide a basis for temporary injunctive relief); *Reynolds v. Rehabcare Group East Inc.*, 531 F. Supp. 2d 1050, 1066 (S.D. Iowa 2008) (same; noting that former employee's request for back pay, liquidated damages, and front pay, if necessary, fell squarely within the types of damages that the Supreme Court found insufficient to show irreparable injury).

Plaintiffs cite several cases that they contend support their argument that they have shown irreparable harm and inadequacy of available remedies at law. The cases Plaintiffs cite, however, are inapposite. *See Henderson v. Bodine Alum., Inc.*, 70 F.3d 958, 962 (8th Cir. 1995) (per curiam) (holding breast cancer patient showed irreparable harm warranting injunctive relief on the claim that her health plan discriminated against her by denying coverage for potential treatment through high-dose chemotherapy and autologous bone marrow transplant, when patient faced disqualification from perhaps her only opportunity for the treatment if injunctive relief were denied, and illness was grave and progressive; noting the patient sought no money for herself, but rather was seeking "urgent medical treatment" through specific performance under her health insurance policy); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511-12 (6th Cir. 1992) (holding that employer established irreparable harm sufficient to support issuance of an injunction enforcing noncompetition and confidentiality agreements with former employees,

where the court found that the employer had suffered, and would continue to suffer, competitive losses and losses of customer goodwill as a result of the former employees' removal of employer's confidential customer information when they left employer for competitor, and as a result of the former employees' contacting of employer's customers promptly after arriving at competitor); *Medtronic, Inc. v. Gibbons*, 684 F.2d 565, 569 (8th Cir. 1982) (affirming district court's finding of irreparable harm, when pacemaker manufacturer sought preliminary injunction restraining former sales representative from violating restrictive covenant in employment contract; irreparable harm finding was supported by evidence showing the sales representative's access to confidential information, his employment by a competitor in the same sales territory, the "symbiotic relationship" between the sales representative and manufacturer in the relevant industry, the relationship between the sales representative and customers, the substantial investment made by the manufacturer in training of its sales representatives, and the substantial assistance given by the manufacturer to its sales representatives in developing customer information and goodwill; it would be extremely difficult or impossible to calculate the sales loss suffered by the manufacturer); *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir. 1981) (holding that district court did not abuse its discretion in issuing preliminary injunction forbidding police department from forcing patrons of adult theaters to give their names and addresses and forbidding the arrest of employees of such theaters when the arrests would tend to close down the theater; stating the possibility of customers being permanently discouraged from patronizing one's business is a substantial threat of harm that cannot be undone through monetary remedies).

      Plaintiffs further cite several cases for the proposition that the prospect of Sparks' likely bankruptcy is sufficient to establish the irreparable harm factor. These cases, however, unlike the present case, involved the overriding concern that a damage award might be granted too late to save a business. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931-32 (1975) (holding that issuance of a preliminary injunction on behalf of proprietors of two bars did not abuse district court's discretion, when proprietors, who sought to enjoin enforcement of town ordinance adversely affecting their business, showed possible irreparable harm in view of their uncontested allegations that, absent such relief, they would suffer substantial business losses and perhaps

where the court found that the employer had suffered, and would continue to suffer, competitive losses and losses of customer goodwill as a result of the former employees' removal of employer's confidential customer information when they left employer for competitor, and as a result of the former employees' contacting of employer's customers promptly after arriving at competitor); *Medtronic, Inc. v. Gibbons*, 684 F.2d 565, 569 (8th Cir. 1982) (affirming district court's finding of irreparable harm, when pacemaker manufacturer sought preliminary injunction restraining former sales representative from violating restrictive covenant in employment contract; irreparable harm finding was supported by evidence showing the sales representative's access to confidential information, his employment by a competitor in the same sales territory, the "symbiotic relationship" between the sales representative and manufacturer in the relevant industry, the relationship between the sales representative and customers, the substantial investment made by the manufacturer in training of its sales representatives, and the substantial assistance given by the manufacturer to its sales representatives in developing customer information and goodwill; it would be extremely difficult or impossible to calculate the sales loss suffered by the manufacturer); *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir. 1981) (holding that district court did not abuse its discretion in issuing preliminary injunction forbidding police department from forcing patrons of adult theaters to give their names and addresses and forbidding the arrest of employees of such theaters when the arrests would tend to close down the theater; stating the possibility of customers being permanently discouraged from patronizing one's business is a substantial threat of harm that cannot be undone through monetary remedies).

    Plaintiffs further cite several cases for the proposition that the prospect of Sparks' likely bankruptcy is sufficient to establish the irreparable harm factor. These cases, however, unlike the present case, involved the overriding concern that a damage award might be granted too late to save a business. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931-32 (1975) (holding that issuance of a preliminary injunction on behalf of proprietors of two bars did not abuse district court's discretion, when proprietors, who sought to enjoin enforcement of town ordinance adversely affecting their business, showed possible irreparable harm in view of their uncontested allegations that, absent such relief, they would suffer substantial business losses and perhaps

even bankruptcy, noting that a favorable final judgment "might well be useless" in the event of a bankruptcy); *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) (granting stay of local competition and pricing rules for telephone local exchange carriers; carriers showed irreparable harm when evidence indicated that without a stay, the opportunity for effective private price negotiations would be irretrievably lost; the carriers would be unable to bring a lawsuit to recover their undue economic losses if the administrative rules were eventually overturned; carriers would be unable to fully recover such losses merely through market participation; and the potential loss of consumer goodwill qualified as irreparable harm); *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 386 (7th Cir. 1984) (stating that one reason a damages remedy can be inadequate is that the damage award may come too late to save the plaintiff's business; analyzing the plaintiff's proof of business losses, and determining that while the loss of the exclusive distributorship agreement would be painful, it would not be fatal to the business; concluding the district judge erred in finding that without the preliminary injunction the plaintiff probably would go out of business, and reversing the district judge's granting of motion for preliminary injunction); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (declining to set aside district court's issuance of preliminary injunction against termination of dealership by manufacturer; determining that right to continue business in which dealer had engaged for twenty years and into which his son had recently entered was not measurable entirely in monetary terms); *B & D Land and Livestock Co. v. Conner*, 534 F. Supp. 2d 891, 908 (N.D. Iowa 2008) (finding there was a credible threat of irreparable harm to corporate producer in the absence of a preliminary injunction, where corporate producer's contention that a denial of present assets or attempts to collect past benefits would force it into bankruptcy was credible, and furthermore the loss of corporate producer's ability to continue its farming operations was not an injury for which there was an adequate remedy at law).

Here, unlike in the above cases, TESA is not doing business and has no significant assets. Plaintiffs do not assert a damage award may come too late to save TESA's business or any other business Sparks has. *See FoodComm Int'l v. Barry*, 328 F.3d 300, 305 (7th Cir. 2003) (citing *Roland Machinery*, 749 F.2d at 386).

Moreover, under the present circumstances, it is questionable whether Plaintiffs have established a threat of irreparable harm on the basis of bankruptcy, because even if Defendants

resume payments, the payments will cease after May 2010, and it is therefore likely that bankruptcy would only be delayed. *See Tuepker v. Farmers Home Admin.*, 684 F.2d 550, 552 (8th Cir. 1982) (affirming district court and stating that the court correctly applied all the *Dataphase* factors, including finding that it was questionable whether the plaintiffs had established a threat of irreparable harm, because plaintiff had defaulted on all of his loans and therefore, even if the loan at issue was given, it was likely that foreclosure would only be delayed). Furthermore, if foreclosure occurs on Sparks' townhouse, the threat of bankruptcy would be significantly less likely than it would be otherwise, because she will then no longer have to pay the $1,530 monthly mortgage payment, and related payments such as property tax and insurance.

Similarly, Plaintiffs have not established irreparable injury based on the threat of Sparks needing to sell the 1983 Mercedes-Benz, which has sentimental value. If Defendants resume payments, it is likely that any need to sell the car would only be delayed. *See id*. Alternatively, if Sparks no longer needs to pay $1,530 monthly mortgage payments, her need to raise money by selling the car would be significantly reduced.

Plaintiffs next argue that they have established irreparable harm with evidence that foreclosure on the townhouse is likely to occur without Defendants' monthly payments, and Sparks will be forced to move. The Court finds this argument unpersuasive for two reasons. First, as with the bankruptcy argument, it is questionable whether Sparks has established a threat of irreparable harm, because even if Defendants resume their payments to her, it is likely that foreclosure would only be delayed. *See id.* Second, although Sparks argues that foreclosure would irreparably harm her because she would have to move, the facts show she has been trying to sell her townhouse since the spring of 2008. The evidence thus indicates that she has been planning to move out of her townhouse irrespective of foreclosure; her main loss from foreclosure, therefore, would be monetary. In this respect, Sparks' claim that she has established a threat of irreparable harm on the basis of having to move out of her house because of foreclosure is distinguished from those cases in which courts have found irreparable harm when a plaintiff is threatened with having to move from his or her house, or with otherwise losing an interest in their property. *See O'Hagan v. United States*, 86 F.3d 776, 783 (8th Cir. 1996)

(holding wife would suffer irreparable injury from forced sale of husband's possessory interest in homestead property which monetary relief could not remedy, and wife was not barred by Anti–Injunction Act from enjoining forced sale; where the sale would destroy the wife's right to exclude all persons other than her husband from the homestead property); *Johnson v. U.S. Dep't of Agric.*, 734 F.2d 774, 789 (11th Cir. 1984) (reversing denial of mortgagors' motion for preliminary injunction to prevent non-judicial foreclosure; stating, "irreparable injury is suffered when one is wrongfully ejected from his home," and noting that real property, and especially a home, is unique; concluding that the plaintiffs would suffer irreparably if they had to live in inadequate, often health endangering housing for any period as a consequence of wrongful ejectment); *Johnson v. Board of Police Comm'rs*, 351 F. Supp. 2d 929, 946 (E.D. Mo. 2004) (concluding that homeless persons claiming board of police commissioners was harassing them with intent to remove them from downtown areas of city showed a significant threat of irreparable harm; homeless persons were likely to suffer repeated violations of their constitutional rights, discouraging them from seeking the services they required for daily living, causing them to miss food, medicine, counseling, treatment, and work opportunities); *Heather K. by Anita K. v. City of Mallard, Iowa*, 887 F. Supp. 1249, 1260 (N.D. Iowa 1995) (finding threat of irreparable harm existed where at "the very least, the threat posed by the lack of a ban or adequate restrictions on open burning is that Heather K. will be ejected from her current residence as it is made untenable by an excessive level of particulates from which the filtration system cannot provide adequate protection"; citing *Johnson*, 734 F.2d at 789 (irreparable harm in wrongful loss of home)).

      The Court finds that in this case, the type of monetary damages Plaintiffs seek falls within the types of damages that the Supreme Court has found insufficient to show irreparable injury. Plaintiffs have an adequate remedy by way of their present action for damages. The Court finds that Plaintiffs have not shown the threat of irreparable harm.

### III.  Balance of Harms

      The balance-of-harms analysis weighs the harm to the parties to the dispute, as well as to other interested parties, of granting or denying the preliminary injunction. *Reynolds*, 531 F.

Supp. 2d at 1068. "The balance of harms must tip decidedly toward the plaintiff to justify issuing a preliminary injunction." *Id.*

Plaintiffs argue that Sparks would suffer irreparable harm, as outlined above, if the Court does not grant injunctive relief. In contrast, Plaintiffs assert, if the Court does grant injunctive relief, Defendants' harm would be minimal, because Defendants have been making the $4,000 monthly payments to her for approximately four years.

As discussed above, Plaintiffs have not demonstrated a substantial threat of irreparable harm. The Court finds, moreover, that Defendants have shown a clear probability that they would be unable to recover any payments made to Plaintiffs if the Court issues preliminary injunctive relief, because Sparks may be insolvent by the end of trial. *See Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir. 1987) (citing *Roland Machinery*, 749 F.2d at 386).

The Court finds that Plaintiffs have not shown a clear balance of hardships in favor of the preliminary injunction.

## IV.  Likelihood of Prevailing on the Merits

When a court considers the likelihood that the movant will prevail on the merits, the court does not decide whether the movant will ultimately win; the movant is not required to prove a greater than fifty percent likelihood that he will prevail on the merits. *PCTC Gold*, 508 F.3d at 1143 (citing *Dataphase*, 640 F. 2d at 113). The moving party must show a "fair chance of prevailing" on the merits. *Oglala Sioux Tribe v. C & W Enter., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008) (comparing the showing required by the moving party seeking a permanent injunction to the showing required for a standard preliminary injunction); *Planned Parenthood*, 530 F.3d at 732-33. A preliminary injunction "'should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion' and presents proof even more substantial than that required on a motion for summary judgment." *Planned Parenthood*, 530 F.3d at 736 (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam)).

### A.  Breach of Contract Claim

Under Iowa law, to prevail on a breach of contract claim, the plaintiff must prove the following elements:  (1) the existence of contract; (2) the contract's terms and conditions; (3)

14

that the plaintiff has performed all the terms and conditions required under the contract; (4) the defendant breached the contract in some particular way; and (5) that the plaintiff has suffered damages as a result of the breach. *Cagin v. McFarland Clinic, P. C.*, 456 F.3d 903, 906 (8th Cir. 2006) (quoting *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)). "A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or any part of the contract." *Id.* at 906-907.

The parties dispute whether Plaintiffs can show the third element, that Plaintiffs have performed all the terms and conditions required under the noncompetition agreement, and therefore whether they can prove that Defendants breached the agreement. Defendants assert that Sparks violated the noncompetition agreement in 2005 when, as a Goalie employee, she shopped at Goalie's three stores in Council Bluffs and Sioux City and provided evaluation reports to Goalie concerning the stores, and when she visited a competitor's store in Sioux City.

Plaintiffs, in contrast, argue they are extremely likely to prevail on the merits, because no evidence shows that Sparks violated the restrictive covenant, which specifically prohibits, "retail marketing, sales, or distribution of adult items in the market areas of the stores, which we know means Iowa, and . . . diverting or soliciting any present, future, or potential customer of the stores, which we know means Pinky's." (Tr. at 123.) Plaintiffs contend that any alleged action Sparks undertook in Iowa was negligible. Even assuming that Sparks took actions prohibited under the agreement, Plaintiffs argue, she has substantially performed her obligations under the contract. Therefore, any alleged breach should be excused as immaterial.

The noncompetition agreement prohibited Sparks from not only directly, but also indirectly, participating in marketing, selling, or distributing adult items in Iowa, and defined "directly or indirectly" participating in such activities as including acting "in any capacity whatsoever" with one exception not at issue. (Defs.' Ex. A at 1.) Although Sparks testified she did not believe that her activities at the stores in Iowa had anything to do with the retail marketing, sale, or distribution of adult items in Iowa, she admitted that the purpose for shopping at and evaluating stores, was to "make the store better" and to "enhance" sales. (Tr. at 91-92.) "Enhance" is defined as, "heighten, increase; especially: to increase or improve in value, quality, desirability, or attractiveness." www.merriam-webster.com (last visited October 20, 2008). The Court finds that Sparks' actions in visiting and evaluating Goalie's three stores in Iowa qualified

as directly or indirectly participating in the marketing, sales, or distribution of adult items in Iowa, as prohibited under the noncompetition agreement.  Furthermore, as the Court found above, Sparks' visit to a competitor's Sioux City store benefited Goalie in its efforts to sell adult items in Iowa.  Based on the greater weight of the credible evidence, the Court finds that Plaintiffs have not made a clear showing that they performed all the terms and conditions required under the contract.

In evaluating Plaintiffs' argument that Sparks' actions in Iowa were negligible and did not constitute a material breach of the noncompetition agreement, the Court notes that she visited and evaluated approximately 43% of her employer's seven Iowa stores.  According to Sparks, Goalie valued the information she provided in her store reports and increased her reporting duties.  She also benefited Goalie's sales efforts by visiting the Sioux City store of a competitor that also had recently opened a store in competition with Goalie's stores in Des Moines.  Based on the existing record, the Court finds that Plaintiffs have not met their burden of persuasion in showing that Spark's' actions in Iowa substantially complied with her obligations under the noncompetition agreement.

Plaintiffs thus have not met the requirement to make a clear showing that they have a fair chance of prevailing on the merits of their claim for breach of the noncompetition agreement.

### B.  Breach of Oral Contract Claim

In their Complaint, Plaintiffs also asserted claims for breach of oral contract, alleging that the "parties entered into oral contracts which provided, among other things, that Ms. Sparks would be entitled to payments of . . . $280,000.00"; Plaintiffs fully performed all duties and obligations under "this oral contract"; any alleged breaches of the agreement were minor and not material, and did not justify stopping payments altogether; Plaintiffs did not breach the agreement; but Defendants breached the oral contract "by canceling these payments."  (Compl. at 2-3.)

Plaintiffs have provided no additional evidence concerning their breach of oral contract claims.  Furthermore, the purchase agreement contained an integration clause stating that the agreement contained the entire understanding between the parties, merging all representations, promises, or understandings between the parties; stating that any other agreements between the

parties with respect to the contract's subject matter were canceled; and stating that the purchase agreement could not be amended, modified, or supplemented except by a writing signed by both parties.  The Court finds, based on the totality of the evidence, that the written purchase agreement was integrated.  *See Cagin*, 456 F.3d at 908 ("Whether or not a written agreement is integrated is a question of fact to be determined by the totality of the evidence"; citing Iowa law).  Accordingly, the parole evidence rule prevents the receipt of extrinsic evidence to contradict or supplement the terms of the agreement, which included the noncompetition agreement.  *See id.* at 907-908.  Based on the record, the Court cannot find that Plaintiffs have met the requirement to make a clear showing that they have a fair chance of prevailing on the merits of their breach of oral contract claims.

### C.  Promissory Estoppel

Plaintiffs also claim that "[p]romissory estoppel requires Defendants to resume its payments."  (Compl. at 3.)  Plaintiffs have provided no additional evidence concerning their promissory estoppel claims, including, but not limited to, how Defendants allegedly engaged in affirmative conduct designed to mislead Plaintiffs.  *See PCTV Gold*, 508 F.3d at 1144 (stating that a party requesting estoppel must show the other party "engaged in affirmative conduct designed to mislead it").  Based on the record, the Court cannot find that Plaintiffs have met the requirement to make a clear showing that they have a fair chance of prevailing on the merits of their promissory estoppel claims.

The Court finds that Plaintiffs have not met their burden to show they have a fair chance of prevailing on the merits of any of their claims.  *See Oglala Sioux Tribe*, 542 F.3d at 229.

## V.  Public Interest

The Court next considers the final *Dataphase* factor, the public interest.

Plaintiffs argue that the public interest favors the granting of a preliminary injunction, because refusing to grant injunctive relief would force the parties to conduct themselves in a manner directly contrary to the express terms of the agreement, and because Sparks is undergoing severe financial hardship as a result of Defendants' actions and may be forced to move out of her townhouse because of foreclosure.  The public interest, Plaintiffs argue, supports keeping people in their homes.  As noted above, however, Sparks decided several

months ago to sell her townhouse, and she has not shown a reasonable likelihood that she will be able to prove her claims.

Defendants assert the public interest is best served by upholding the noncompetition agreement that the parties entered. The Court agrees. *See Modis, Inc. v. Barth*, No. 4:08CV01533 ERW, 2008 WL 4596190, *1 (E.D. Mo. Oct. 14, 2008) (stating the "public interest is protected by enforcing valid contracts").

The Court finds that the public interest favors denying issuing a temporary restraining order or preliminary injunction.

## CONCLUSION

Based on its analysis of the *Dataphase* factors, the Court finds that the balance of equities do not support the granting of a preliminary injunction or temporary restraining order. Specifically, the Court finds that Plaintiffs have not established that they will suffer irreparable harm if the Court does not issue a preliminary injunction, that they have a fair chance of prevailing on the merits, that the balance of harms weighs in favor of issuing a preliminary injunction, and that the public interest weighs in favor of issuing a preliminary injunction. *See Doe*, 216 F.R.D. at 468 (stating the failure to show the threat of irreparable harm is, by itself, a sufficient ground on which to deny injunctive relief); *see Adam-Mellang*, 96 F.3d at 299 (same). Accordingly, the Court respectfully recommends that Plaintiffs' motion for a preliminary injunction and a temporary restraining order be denied.

## .        RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED, under 28 U.S.C. § 636(b)(1)(B), that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Clerk's No. 3) be **denied** for the reasons discussed above.

IT IS ORDERED that the parties have until November 10, 2008, to file written objections to this Report and Recommendation, under 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990) (per curiam); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993). The Court will freely grant

such extensions. *Martin v. Ellandson*, 122 F. Supp. 2d 1017, 1025 (S.D. Iowa 2000). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and set forth the basis for such objections. *See* Fed.R.Civ.P. 72; *Thompson*, 897 F.2d at 357; *Martin*, 122 F. Supp. 2d at 1025. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Newton*, 259 F.3d 964, 966 (8th Cir. 2001) (citing *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994)).

**IT IS SO ORDERED**.

Dated this 21st day of October, 2008.

_____
CELESTE F. BREMER
UNITED STATES MAGISTRATE JUDGE